FILED
United States Court of Appeals
Tenth Circuit

February 28, 2008

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JAIME PORTILLO-PORTILLO,

Defendant-Appellant.

No. 07-2070

(D. of N.M.)

(D.C. No. CR-06-1453-MCA)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **EBEL**, and **TYMKOVICH**, Circuit Judges.

Pursuing a group of suspects who had run away from them earlier in the day, United States Border Patrol agents in the City of Deming, New Mexico visited a motel known as a way station for illegal aliens. After determining that one of the two rooms previously used for these purposes was occupied, the agents knocked on the door to continue their investigation. Following a brief conversation, the person who opened the door admitted his unlawful status. He was arrested. One of the agents then asked the other occupant—later identified as

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Jaime Portillo-Portillo—whether he was a United States citizen. Portillo-Portillo admitted he was a citizen of Mexico, illegally present in the United States. The agent arrested Portillo-Portillo and took him to the Border Patrol station for processing.

Prior to trial, Portillo-Portillo moved to suppress his statement to the agent as well as his immigration file as the fruits of Fourth Amendment and *Miranda* violations. The district court rejected both arguments and denied the motion. Finding the agent had reasonable suspicion to briefly detain Portillo-Portillo and ask about his citizenship, we AFFIRM the district court's denial of the motion to suppress.

## I. Background

At the suppression hearing, Border Patrol Agents Victor Guzman and Julian Miranda, as well as Eduardo Rodriguez-Garcia (the other occupant of the motel room where Portillo-Portillo was discovered), testified about the circumstances surrounding the incident. The district court found the following facts, which are not challenged on appeal as clearly erroneous.

*Early Encounter with a Group of People.* In the late afternoon on April 23, 2006, Agent Guzman, an experienced border agent with thousands of immigration-related arrests, and Agent Miranda, a trainee, were patrolling the City of Deming, New Mexico. Deming lies about 35 miles north of the United States-Mexico border, along major east-west highway and railroad routes.

The agents, in uniform and in a marked Border Patrol vehicle, were traveling west on Pine Street as they noticed a large group of people. When the agents approached the group, everybody in the group fled north. To pursue the suspects, the agents drove around the block and down the alley to cut off the escape route. Driving down the alley, they spotted members of the group sitting near an abandoned house. As soon as the agents approached, these people scattered. Several ran in the direction of El Mirador Motel, located three or four blocks away.

Guzman and Miranda continued the pursuit and eventually apprehended six to twelve people from this group. None was able to provide evidence of lawful presence in the United States, and the agents took them to the Border Patrol station for processing.

*El Mirador Motel.* After leaving the station, the agents drove to El Mirador to look for those who had run away in the general direction of the motel. Guzman and Miranda were interested in El Mirador because of their prior experience with two specific rooms that had been used as a temporary stopping point for illegal immigrants.

The two rooms are ideally situated to allow for undetected entry and exit. El Mirador's two wings form an "L" shape, and the favored rooms sit in the corner where the two wings meet. Unlike doors to all other rooms that open up to face a parking lot, a public street, and a restaurant frequented by Border Patrol

agents, the two rooms in question open up in the other direction, away from busy public areas. These two rooms open towards a small walled courtyard, partially blocked from view by vegetation growing on the walls. Usually one or two ladders are propped against the wall, allowing for easy and discreet escape from either room, over the wall, and into the adjoining side streets. When the agents arrived at El Mirador, one ladder was leaning against the wall in a way that would allow one to easily scale it.

Agent Guzman asked the motel clerk if anyone was staying in either of the two rooms. The clerk showed him the registration card for one of the rooms, which listed nothing but the name of the occupant. In Guzman's experience, motel registration cards typically contain more information—for example, the registered guest's permanent address and vehicle information. Thus the listing of only the guest's name indicated to Guzman a possibility the guest was an undocumented alien. Guzman asked and received the clerk's permission to go up to the room and knock on the door.

*Encounter at the Room.* Agent Miranda stayed in the parking lot with the Border Patrol vehicle while Guzman knocked on the door of the room in question. Rodriguez-Garcia opened, and without stepping into the room, Guzman observed another person, later identified as Jaime Portillo-Portillo, siting on a bed. Guzman, speaking in Spanish after noticing Rodriguez-Garcia's difficulty with English, identified himself as a Border Patrol agent and said he was there looking

-4-

for the people who had run away from him earlier in the day. He then asked Rodriguez-Garcia whether he was a United States citizen. Rodriguez-Garcia replied he was but could not produce any identification. Guzman, sensing nervousness, told Rodriguez-Garcia he could face criminal charges for lying about citizenship status. Rodriguez-Garcia then recanted his statement and admitted he was a citizen of Mexico. Guzman asked Rodriguez-Garcia to step out of the room and placed him under arrest.

Still standing outside the room, Guzman for the first time spoke to Portillo-Portillo and asked about his citizenship. Portillo-Portillo readily admitted he was a citizen of Mexico, illegally present in the United States. Guzman asked Portillo-Portillo to exit the room and arrested him.

*Identification at the Station.* The agents took Portillo-Portillo to the Border Patrol station and handed him over to processing agents. As a result of fingerprinting, Portillo-Portillo's immigration file indicated he had a prior deportation subsequent to an aggravated felony conviction. He accordingly was indicted for violating 8 U.S.C. §§ 1326(a) and (b).

Prior to trial, Portillo-Portillo moved to suppress his statements and identity evidence, arguing they were obtained in violation of his Fourth Amendment and *Miranda* rights. The district court rejected both arguments and denied the motion. On appeal, Portillo-Portillo raises only the Fourth Amendment arguments.

## II. Analysis

"When reviewing a district court's decision on a motion to suppress, we 'accept the district court's factual findings unless they are clearly erroneous. The ultimate determination of reasonableness is a question of law reviewable de novo.'" *United States v. Rice*, 483 F.3d 1079, 1082 (10th Cir. 2007) (quoting *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1258 (10th Cir. 2006)).

At the outset, we keep in mind the three types of police-citizen encounters: (1) "voluntary cooperation of a citizen in response to non-coercive questioning"; (2) an investigatory detention, or "a *Terry* . . . stop, involving only a brief, non-intrusive detention and frisk for weapons when officers have a reasonable suspicion that the defendant has committed a crime or is about to do so"; and (3) "the arrest of the defendant." *United States v. Johnson*, 364 F.3d 1185, 1188 (10th Cir. 2004) (quotation omitted); *see also Oliver v. Woods*, 209 F.3d 1179, 1185–86 (10th Cir. 2000) (explaining the types of police-citizen encounters in more detail). The parties here agree the interaction between Guzman and the room's occupants began as a consensual encounter. They also agree Guzman had probable cause to arrest Portillo-Portillo after he had admitted his unlawful presence in the United States.

The government and Portillo-Portillo part company there. Portillo-Portillo disputes on this record when the encounter escalated into an investigatory detention, requiring the showing of a reasonable suspicion by Agent Guzman. He

argues Guzman detained him at the moment Rodriguez-Garcia was arrested. The government, in response, relies on the district court's conclusion that the encounter remained consensual until Guzman arrested Portillo-Portillo.

But we need not resolve this dispute because the government, in the alternative, argues that even if Portillo-Portillo were considered seized at the moment of Rodriguez-Garcia's arrest, reasonable suspicion supported the seizure. We agree. Agent Guzman had reasonable suspicion to detain Portillo-Portillo for the limited purpose of asking about his citizenship. We can therefore assume, without deciding, that the voluntary encounter escalated into an investigatory detention when Guzman arrested Rodriguez-Garcia and turned his attention to Portillo-Portillo. *See Johnson*, 364 F.3d at 1189.

## A. Investigatory Detentions

We analyze investigatory detentions under a two-part framework developed in *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny. The reasonableness of an investigatory detention depends on "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (en banc) (quoting *Terry*, 392 U.S. at 20). The detention is justified at its inception "if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." *United*

*States v. Quintana-Garcia*, 343 F.3d 1266, 1270 (10th Cir. 2003) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)) (internal quotation omitted).

To "determin[e] whether an investigatory stop is supported by reasonable suspicion, courts must 'look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.'" *Id.* (quoting *Arvizu*, 534 U.S. at 273) (internal quotations omitted). The focus on the totality of the circumstances, rather than each individual circumstance, underscores that "a court may not engage in a 'sort of divide-and-conquer analysis' by evaluating and rejecting each factor in isolation." *United States v. Cheromiah*, 455 F.3d 1216, 1221 (10th Cir. 2006) (quoting *Arvizu*, 534 U.S. at 267). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu*, 534 U.S. at 273 (quotation omitted).

Quantitatively, reasonable suspicion means something less than probable cause and "falls considerably short of satisfying a preponderance of the evidence standard." *Cheromiah*, 455 F.3d at 1220 (quoting *Arvizu*, 534 U.S. at 274). In other words, all that reasonable suspicion requires is "some minimal level of objective justification." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quotation omitted). And while a mere hunch is not enough, the detaining officer need not rule out innocent explanations before concluding the totality of information

known to the officer, combined with experience, supports a brief investigatory detention. *Arvizu*, 534 U.S. at 274, 277; *Sokolow*, 490 U.S. at 7, 10.

**B. Application**

Agent Guzman briefly detained Portillo-Portillo in a motel room to ask about his citizenship. At that precise moment, Guzman knew the following:

(1) The City of Deming lies about 35 miles north of the United States-Mexico border;

(2) In Agent Guzman's nine-year experience, he apprehended thousands of illegal aliens in Deming;

(3) Earlier in the day, a large group of people fled from Guzman and Miranda;

(4) When the agents apprehended some individuals from that group, none was able to provide proof of lawful presence in the United States;

(5) When the group ran away from the agents, some, by virtue of scattering, ran in the general direction of El Mirador motel;

(6) In Guzman's experience, two particular rooms in El Mirador commonly serve as a temporary way station for illegal aliens because the rooms' location allows for discreet entry and exit (unlike all other rooms that can easily be seen from a public street and a restaurant frequented by Border Patrol agents);

(7) When the agents pulled up to El Mirador, a ladder was propped against a wall outside the rooms in question, indicating possible illegal alien activity;

-9-

(8) When Guzman asked the motel clerk if anyone was staying in one of the two rooms, the clerk said one room was in fact occupied;

(9) The registration card for the occupied room contained only the guest's name, indicating to Guzman the guest may be in the United States illegally (in Guzman's experience, lawful residents typically list their permanent address as well as vehicle information on motel registration cards); and

(10) When Guzman knocked on the occupied room, Rodriguez-Garcia opened the door and, after initially stating he was a United States citizen, nervously admitted he was actually an illegal alien.

Only at that point did Guzman turn his attention to Portillo-Portillo.

Taking the facts in their totality, Guzman, after arresting Rodriguez-Garcia, had reasonable suspicion to believe Portillo-Portillo likewise was an illegal alien. A reasonable border agent could have concluded Rodriguez-Garcia and Portillo-Portillo were traveling together and were part of the group that had already yielded a large number of illegal aliens earlier in the day. Further investigation was justified under any objective view of the facts.

Nor was the scope of Portillo-Portillo's detention unreasonable. Agent Guzman asked a single question to try to ascertain whether Portillo-Portillo was a United States citizen. Border Patrol agents' special function makes it clear that, if nothing else, they can ask suspects about citizenship to allay reasonable suspicion of illegal alienage. *See Cheromiah*, 455 F.3d at 1222 ("Border Patrol

agents who stop a vehicle based on a reasonable suspicion that the vehicle contains illegal aliens ordinarily may question the vehicle's occupants about their citizenship . . . ."); *see also* 8 C.F.R. § 287.8(b)(2) ("If the immigration officer has a reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States, the immigration officer may briefly detain the person for questioning."). Thus, the brief investigatory detention of Portillo-Portillo was reasonable both at inception and in scope.

In arguing the brief investigatory detention was unreasonable at its inception, Portillo-Portillo misconstrues our case law in two ways. First, Portillo-Portillo maintains the agents' earlier encounter with a group that eventually ran away does not amount to reasonable suspicion to detain Portillo-Portillo. But that kind of analysis invites us into the divide-and-conquer world the Supreme Court has flatly rejected in deciding questions of reasonable suspicion. *See Arvizu*, 534 U.S. at 267. We are not implying the agents' earlier encounter with a group of people would, taken alone, necessarily justify a brief investigatory detention. Rather, in light of the totality of information available to Guzman and Miranda at the time they encountered Portillo-Portillo, the agents had reasonable suspicion of illegal entry. That information included not only the earlier encounter with a group of people, many of whom were illegal aliens, but also the conversation with the motel clerk as well as questioning and arrest of Rodriguez-Garcia.

Second, Portillo-Portillo argues Guzman did not have reasonable suspicion because the agents did not actually see him enter the motel room, and because none of the people apprehended earlier mentioned Portillo-Portillo to the agents. But to justify an investigatory detention by reasonable suspicion, Guzman needed to have only "some minimal level of objective justification." *Sokolow*, 490 U.S. at 7 (quotation omitted). Accordingly, even without the additional information that Guzman did not have—information Portillo-Portillo's argument deems necessary to support reasonable suspicion—the agent had enough to suspect that Portillo-Portillo may have been in the United States illegally, or at least harboring or assisting Rodriguez-Garcia, who they knew by then had entered the United States illegally. Guzman's suspicion was more than a mere hunch.

In sum, under the totality of the circumstances, Guzman had reasonable suspicion to detain Portillo-Portillo for the purpose of asking him a single question about his citizenship.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's denial of the motion to suppress evidence obtained from Portillo-Portillo's immigration file.

Entered for the Court,

Timothy M. Tymkovich
Circuit Judge